# UNITED STATES DISTRICT COURT
# IN THE WESTERN DISTRICT OF MICHIGAN

ARNOLD KWIATKOWSKI,

      Plaintiff,

                                   Case No. 26-
                                   Hon.

v.

ALLEGAN COUNTY;
SGT. JEFF LABRIE; DEPUTY C. BENNEAR;
ADVANCED CORRECTIONAL HEALTHCARE;
TAMMY PROVATAS, MD; ROBBI ROOT, RN;
JEAN DORMAN, RN; JACK REX, RN;
ELIZABETH KITCHEN, LPN; J.W., LPN;
BRANDI EMMONS, LPN;
MACKENZIE GREEN, LPN; and
BRIANNE SEINEN, LMSW,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

**NOW COMES** Plaintiff Arnold Kwiatkowski, by and through his counsel, Ven Johnson Law, PLC, with the following allegations against the above-captioned defendants:

1. At all relevant times, Plaintiff, Arnold Kwiatkowski ("Arnold"), was a resident and or pretrial detainee of Allegan County, in the State of Michigan.

2. At all relevant times, Defendant Allegan County was a municipality or a political subdivision in the State of Michigan.

3. At all relevant times, all personnel at Allegan County Sheriff's Office and Corrections Center were employed by Allegan County and acted under color of state law.

4. At all relevant times, the Allegan County Jail (ACJ or "the jail") was operated and staffed by the Allegan County Sherrif's Office and Corrections Center at 640 River Street in Allegan Michigan.

5.At all relevant times, Jeff LaBrie ("LaBrie"), was a sergeant with the Allegan County Sheriff's Office and Corrections Center and, together with all other correction officers present during Plaintiff's detention, was responsible for amongst other things the care, safety, control, supervision, and/or monitoring of the detainees at the jail.

6.Upon information and belief, at all relevant times, "C. Bennear, #1211" ("Bennear) was a deputy with the Allegan County Sheriff's Office and Corrections Center and, together with all other correction officers present during Plaintiff's detention, was responsible for amongst other things the care, safety, control, supervision, and/or monitoring of the detainees at the jail.

7.At all relevant times, Defendant Allegan County contracted with Advanced Correctional Healthcare ("ACH") to provide medical services, amongst other things, for the benefit of all detainees at the jail.. All personnel for ACH working at the jail acted under color of state law.

8.Under both the American Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"), Defendant Allegan County was responsible for amongst other things all contractors providing services, including medical care and treatment, to the jail detainees.

9.At all relevant times, Tammy Provatas, MD ("Dr. Provatas") worked for ACH. At THE JAIL, Dr. Provatas was responsible for amongst other things providing care and treatment to the detainees as well as supervising ACH personnel staffed at the jail.

10.At all relevant times, "RR" or Robbi Root, RN worked for ACH and was responsible for amongst other things providing care and treatment to the detainees at the jail.

11.At all relevant times, "JD" or Jean Dorman, RN worked for ACH and was responsible for amongst other things providing care and treatment to the detainees at the jail.

12.At all relevant times; "JR" or Jack Rex, RN ("Rex") worked for ACH and was responsible for amongst other things providing care and treatment to the detainees at the jail.

2

13. At all relevant times, "EK" or Elizabeth Kitchen, LPN ("Kitchen") worked for ACH and was responsible for amongst other things providing care and treatment to the detainees at the jail.

14. Upon information and belief, at all relevant times an adult with the initials "J.W." worked as a licensed practical nurse (LPN) for ACH and was responsible for amongst other things providing care and treatment to the detainees at the jail.

15. At all relevant times, "BE" or Brandi Emmons, LPN ("Emmons") worked for ACH and was responsible for amongst other things providing care and treatment to the detainees at the jail.

16. At all relevant times, "Kg" or MacKenzie Green, LPN ("Green") worked for ACH and was responsible for amongst other things providing care and treatment to the detainees at the jail.

17. At all relevant times, Brianne Seinen, LMSW ("Seinen") worked for ACH and was responsible for amongst other things providing care and treatment to the detainees at the jail.

18. The defendants are each named in their respective capacities both officially and individually.

19. As more information becomes available, Plaintiff reserves the right to amend this pleading to add more defendants and/or to revise the identity of any existing defendant described here.

### JURISDICTION & VENUE

20. This action arises under the laws of the United States, which includes but is not limited to the Constitution, 42 U.S.C. §§ 1983, 1988, 42 U.S.C. § 12101, et seq., and 29 U.S.C.§ 794; as well as under the statues and common laws of the State of Michigan.

21. This Court has jurisdiction over the claims brought under the ADA as well as Section 504 pursuant to 28 U.S.C. §1331.

22. This Court has original jurisdiction over the federal questions raised in this action under 28 U.S.C. §§ 1331, 1343, 42 U.S.C. §§ 1983, 1988, et. al.

23. This Court has jurisdiction over the remaining State law claims pursuant to 28 U.S.C. §1367.

3

24. Venue is proper pursuant to 28 U.S.C. §§ 1391 (b) because the defendants reside and/or work within the bounds of the Western District of Michigan and the acts or omissions alleged in this Complaint occurred in Allegan County, Michigan.

## COMMON ALLEGATIONS

25. Plaintiff reasserts and incorporates here each allegation stated above.

26. On September 19, 2023, Arnold was arrested and brought to Allegan County Jail (ACJ or "the jail").

27. At the time of his arrest and pre-trial detention, Arnold was 51-years old and disabled.

28. Arnold entered ACJ with a variety of physical and mental impairments that substantially limited his ability to walk, stand, bend, lift, think, and/or concentrate amongst other things.

29. Despite his disabilities, "cooperative" and "pleasant" were words frequently used in Arnold's JAIL records to describe his attitude and interactions with the deputies, staff and other detainees.

30. Though the charges were ultimately dismissed within a few months of his arrest, Arnold still endured two and half weeks as a pretrial detainee at ACJ from September 19, 2023 through October 5, 2023.

31. It was during the time of his pre-trial detention at ACJ that Arnold was exposed to a deadly infection (*osteomyelitis*) that spread from the bone in his right foot into his bloodstream.

32. For the duration of his detention, the defendants repeatedly failed to acknowledge the obvious and substantial risk of serious harm that Arnold faced while in their custody.

33. Moreover, the defendants repeated failed to provide Arnold with the reasonable accommodations and/or modifications that he needed and was entitled to as a disabled person.

## PLAINTIFF'S DISABILITIES

34. Before his right foot was infected at ACJ, Arnold was permanently disabled.

4

35. At 27 years old in 1998, Arnold suffered catastrophic injuries from head to toe that included a traumatic brain injury (TBI) and fractured bones in his low back, right hip, and right foot.

36. Those injuries were significantly exacerbated the following year while Arnold was working on his family's humble farm and fell several feet to the ground from a tractor.

37. From 1998 through 2011, Arnold underwent countless surgeries primarily to reconstruct and repair his right hip and right foot.

38. Efforts to reconstruct the bones and joints in his right foot were often complicated by compartment syndrome that in turn necessitated repeated fasciotomies.

39. The degree of instability and deformity in his right foot led to his bones being fused in three places (*Triple Arthrodesis*) and secured with plates and screws.

40. Years of treatment notwithstanding, Arnold suffered from the effects of the permanent damaged caused to his musculoskeletal and neurological systems as well as the permanent mental impairments linked to his TBI and chronic pain.

41. In sum, since 1998 Arnold's multiple impairments have imposed substantial limitations on a variety of life's major activities, including but not limited to the following:

      a.  walking;

      b.  standing;

      c.  bending;

      d.  lifting;

      e.  manual tasks;

      f.  thinking;

      g.  concentrating;

      h.  sleeping; and

i.  eating.

42. Before he was in the defendants' custody, Arnold managed his physical and mental impairments through a combination of medications and assistive tools.

43. At the time of his arrest in 2023, prescriptions to treat his chronic pain and mental impairments together with the consistent use of appropriate footwear and orthotic devices permitted Arnold to exist without being exposed to predictable risks.

44. The added support from an orthotic allowed Arnold to maintain enough balance to walk and avoid developing sores underneath his foot.

45. Covered footwear helped to secure Arnold's orthotic device and shielded the bottoms of his feet from bacteria and other contaminants on floor surfaces.

46. Similarly, he could hardly eat, sleep, or think clearly without the intricate protocol of medications curated over time by Arnold's doctors to treat all his conditions which most notably included chronic pain, anxiety, and ADHD.

**ALLEGAN COUNTY JAIL (ACJ) & ADVANCED CORRECTIONAL HEALTHCARE (ACH)**

47. Arnold entered the jail on September 19th, around 7:00 a.m. wearing the boots he was arrested in and walking with a severe limp.

48. The metal detector was triggered when Arnold passed through and Arnold promptly explained to the deputies monitoring the detector that the surgical hardware in his hip and right foot was responsible for sounding the alarm.

49. The deputies confirmed that the alarm was not set off by weapons or contraband on his person and allowed Arnold to enter.

50. Upon information and belief, Defendant Sgt. LaBrie ordered Arnold to surrender his boots and orthotic in exchange for a pair of the jail's standard issued flip flops.

51. Arnold's boots held his orthotic in place and kept his foot enclosed and off the ground when he walked. His orthotic provided the support and alignment he needed to avoid developing infectious sores on the soles of his feet.

52. Arnold knew the formless flip flops could not offer the support and protection he needed to properly ambulate around the jail.

53. Arnold politely explained the significance of his boots and orthotic to Defendant LaBrie so that he would understand why he needed to keep theses assistive tools.

54.  Even with Arnold's plates, screws, severe limp, and polite requests, Defendant LaBrie refused to permit Arnold to retain his protective footwear and orthotic.

55. Arnold was stuck with the standard jail's flip flops.

56. Not a moment was spared by LaBrie, or any other personnel, to consider a modification or reasonable accommodation for Arnold's obviously impaired ability to walk.

57. Along with issuing flip-flops, Booking also required Arnold to complete THE JAIL's *Booking Questionnaire*.

58. Upon information and belief, Defendants Deputy C. Bennear and Brandi Emmons, LPN, from ACH reviewed and transcribed Arnold's responses to the Booking Questionnaire.

59. The form sought to document the defendants' observations as well as Arnold's answers to over 50 standard questions about his mental and physical health.

60. Arnold disclosed his "Physical Handicaps" to the defendants in response to line 251 which noted in the comment section, "RIGHT SIDE PELVIS AND FOO[T] AND LOWER BACK."

61. As Arnold recounted the origins of his disabilities, the defendants handwrote "Farm accident Nov. 1998" into the margins of the form.

62.Regarding Arnold's "Body Deformities/Ease of Movement" at line 259 the defendants entered "PAIN IN RIGHT LOWER SIDE OF BODY."

63.Even with Arnold's full disclosures and obvious demonstrations of his disabilities, Defendants Emmons and Bennear did nothing. Neither Defendant offered an alternative to the flip flops or a mobility device (e.g. cane, wheelchair, walker, etc.) to allow Arnold to safely ambulate around the jail without his boots or orthotic.

64.Emmons recorded Arnold's extensive regiment of prescribed and over-the-counter medications on the *Medication Verification Form*, which included: Fluticasone (for allergies); Ventolin HFA (asthma inhaler); Triamcinolone (an ointment used for eczema); Carvedilol (hypertension); Methadone (for chronic pain); Cymbalta (chronic pain and depression); Klonopin (anti-anxiety); and Adderall (ADHD).

65.For each of Arnold's medications, the form contained the name of the prescription or medication, the dosage, pharmacy name, and the date it was last filled.

66.Defendant Emmons used the "Narrative Progress Note" to capture the medical history of Arnold's disabilities back to his first accident in 1998 and the "multiples surgeries" that Arnold disclosed.

67.For the list of Arnold's "Medical Problem List," Emmons recorded Asthma, hypertension, right side pelvis pain, right foot pain, and lower back pain.

68.On the "Medical Communication Form" for the deputies, Defendant Emmons indicated that Arnold needed a "Bottom Bunk" and a cell on the "Bottom Level."

69.Rather than further investigate the nature and extent of Arnold's mental or physical impairments, ACH abruptly chose to discontinue his prescriptions for Methadone (50 mg per day), Adderall (60 mg per day) and Klonopin (2 mg per day) without substitutions.

8

70. There was no evidence or suspicion of alcohol or opiate abuse. Yet, ACH mechanically forced Arnold into withdrawal from Methadone and Klonopin, enlisting him into the one-size-fits-all monitoring program—Clinical Institute Withdrawal Assessment (CIWA) and Clinical Opiate Withdrawal Scale (COWS).

71.Thus, from the first day of his detention,  Arnold was stripped of his walking aids, prescriptions for chronic pain, ADHD, and anxiety, without any modifications or accommodations in exchange.

72.Defendants' records show that the forms Emmons filled out with Arnold on September 19th were reviewed by Dr. Provatas three days later.

73.The risk of serious harm to Plaintiff without reasonable accommodation or modification for his disabilities was obvious.

74.For Arnold, walking in flip flops was no different than walking barefoot.

75.Without sufficient support for his foot or a walking device, most of the steps Arnold attempted landed his right foot on the ground rather than inside the flip flop.

76.Arnold went from walking with a severe limp with his right foot protected inside of his boot to hobbling.

77.His inability to safely ambulate around the jail as a detainee prevented and/or substantially limited his ability to access meals, the showers, obtain suitable exercise, or participate in recreation.

78.Arnold's heightened challenges with chronic pain, anxiety, and ADHD without his medications was evident.

79.Arnold went from a 50 mg daily dose of Methadone to nothing.

80.On his third day of cold-turkey, Arnold conveyed his inability to eat as a result of the "severe pain" that he was in.

81. Finally, Dr. Provatas responded by prescribing 15 mg of Mobic per day.

82. Not surprisingly, Arnold's chronic pain and discomfort continued to overwhelm his ability to think, sleep, and eat.

83. On September 22nd, Arnold's nausea was cited in the notes that recorded his withdrawal symptoms from Klonopin.

84. In another Kite on September 23rd, Arnold re-stated his long-term history on Adderall and his inability to "think clearly" without it.

85. Arnold stated his "need" for a "thicker bed mat because of his chronic pain" in his next Kite on September 24th.

86. A Medical History and Health Appraisal, also dated September 24th, was filled out by Defendant Jean Dorman, RN with Arnold. There, Dorman documented Arnold's disabilities in even greater detail than her colleagues.

87. Dorman wrote that Arnold had undergone more than 20 surgeries since 1998 that included "*L4-L5 [low back], reconstruction [right] pelvis, [right] foot triple arthrodesis*" [emphasis added] along with the name of the practitioner that "currently" managed his care and treatment- Dr. Hollingsworth.

88. On September 25th, Arnold repeated the extent of his challenges with thinking clearly without his prescription for Adderall. To which Defendant MacKenzie Green, LPN responded by passing Arnold off to mental health to be screened for suicide while reciting the jail's one-size-fits all policy that did not "typically" provide Adderall and encouraging Arnold to simply write another Kite if his issues persisted.

89. In the same note, Green denied Arnold's request for a thicker mat and then told him to ask a correction officer instead.

90. Green's mental health referral led to Arnold being seen on September 28th by Brianne Seinen, LMSW, a mental health clinician with ACH.

91. Arnold patiently repeated his concerns to Defendant Seinen who the following: "difficulty sleeping due to being in pain and not receiving his usual pain medication following being in a motorcycle accident. He stated he has been following up with medical. This writer encouraged him to continue doing so."

92. Since he was denied his prescription for methadone, Arnold asked Seinen if there were "other pain medications." But Arnold was again passed off and told to follow up with someone else.

93. Meanwhile, the flip flops had caused sores to develop underneath his right foot and to become infected.

94. The first treatment indicated in the defendants' records of Arnold's foot sores does not appear until October 1, 2023.

95. October 1st also marked Arnold's 12th day without the boots and orthotic that he begged the defendants to retain.

96. By October 1st two prominent sores had developed on the sole of Arnold's right foot.

97. Defendant Elizabeth Kitchen, LPN described one sore as a "6 mm deep, 15 mm wide open wound." The second sore measured "25 mm wide, red granulated, starting to ulcerat[e] in center." The wounds were remarkable and concerning enough to photograph, as shown below, to include in Arnold's chart:

11



98. Though it was too late for Arnold's boots to spare him from the infection he tried to avoid, Defendant Kitchen finally authorized the deputies to return Arnold's boots.

99. Kitchen's record also recommended that Arnold's wounds be kept "clean" and "dry."

100. ACH's records purportedly document that Arnold's infectious sores were rebandaged and rinsed with saline solution from October 1st up through the evening he was released on October 5th to the hospital for further treatment.

101. The records purport that Emmons treated and bandaged Arnold's sores on October 1st.

102. When Arnold's sores were allegedly treated the next day, October 2nd, Defendant Robbi Root's, RN initials appear in the record.

103. For several days, the defendants described the deteriorating state of Arnold's open sores with terms like "red granulation," "odor," and "purulent drainage."

104. On October 3rd, Defendant nurse Jack Rex's initials ("JR") appear next to the treatment and observations of Arnold's sores without any further action noted.

105. In the evening on October 4th, another ACH LPN with the initials J.W. noted "redness" and "heat coming from the top of Arnold's foot" and a prescription for an antibiotic-Keflex.

106. The antibiotic does not appear to have become available until early the next morning on October 5th with Defendant Green.

107. When Defendant J.W. saw Arnold again in the evening on October 5th, J.W. called Dr. Provatas to report that Arnold's infection had worsened.  Dr. Provatas instructed J.W. to request transport to Ascension Hospital to "rule out osteomyelitis."

108. In the two-and-a-half weeks that Arnold was at ACJ, Dr. Provatas never saw or treated Arnold in person.

109. Notably, the records and photographs that documented the clear progression of infection underneath Arnold's foot between October 1st and October 5th were not reviewed by Dr. Provatas until October 13.

110. When Arnold arrived at Ascension Hospital the attending emergency room physician immediately identified his "concern for osteomyelitis" and that the stage of infection could warrant amputation.

111. The attending physician wasted no time calling for Arnold to be urgently transferred to Holland Hospital for further consultation and potential emergency surgery.

112. Within hours of his arrival at Holland Hospital, Arnold's fifth toe was amputated. But his surgeons were not optimistic about the odds of keeping the remaining toes on his right foot: "[a] guarded outlook for the remainder of the forefoot and high likelihood of ultimately requiring a transmetatarsal amputation."

113. Unfortunately, the surgeons' guarded assessments were prudent. Roughly one year later, Arnold's remaining toes along with more of the bone (cuboid) in his foot also had to be removed.

### COUNT I: DELIBERATE INDIFFERENCE—FOURTEENTH AMENDMENT
### AGAINST DEFENDANTS LABRIE, BENNEAR, PROVATAS, KITCHEN, GREEN, SEINEN, DORMAN J.W., REX, ROOT, AND EMMONS

114. Plaintiff reasserts and incorporates here each allegation stated above.

115. As a pretrial detainee, Plaintiff was guaranteed rights to due process and equal protection under the Fourteenth Amendment of the United States Constitution.

13

116. "A Fourteenth Amendment substantive due process violation can occur when the state takes an individual into its custody and then fails to adequately ensure [their] safety and well-being." *Cherrington v. Skeeter*, 344 F.3d 631, 637 (6th Cir. 2003).

117. When the government restrains an individual's liberty such that it renders them unable to care for themselves, the government is obligated under both the Eighth and the Fourteenth Amendments of the United States Constitution to provide for that individual's basic needs which include medical care, food, clothing, shelter and reasonable safety. *Deshaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 200 (1989).

118. At all times relevant, each of the named defendants, from Allegan County Jail (ACJ) and Advanced Correctional Health Care (ACH), knew or should have known the substantial risk of serious harm Arnold continuously faced as their pretrial detainee.

119. The defendants either knew or should have known the seriousness of Plaintiff's medical conditions.

120. Nonetheless, the defendants acted with deliberate indifference to Plaintiff's objectively serious medical needs while he was in their custody.

121. Decades before he was taken into custody by the defendants, Plaintiff was permanently disabled from injuries that he had sustained in two separate accidents.

122. From the moment he came into the defendants' custody, the permanent injury Plaintiff sustained to his head, low back, right hip, and right foot gave rise to the serious medical conditions were repeatedly disclosed by Plaintiff and documented by the defendants.

123. Plaintiff's constant challenges with keeping his foot off the jail floors while trying to ambulate around the jail in flip flops were on constant display and repeatedly diminished and/or deliberately ignored by the defendants.

14

124. As a result, Plaintiff's writhing pain and related difficulty eating, thinking and walking grew more pronounced as the two gaping sores developed underneath his right foot.

125. When the defendants could have and should have taken reasonable measures to provide Plaintiff with adequate medical care and supplies/devices to accommodate Plaintiff's impairments, they didn't.

126. Defendants failed to take reasonable measures to provide Plaintiff with the medical treatment and supplies he needed despite having the ability to do so.

127. Likewise, the defendants failed to provide Plaintiff with the medications and supplies that he needed to manage his chronic pain, anxiety, and ADHD.

128. The defendants intentionally or recklessly ignored Plaintiff's serious medical needs and caused the infection that ultimately led to the amputation of all the toes on his right foot.

129. The defendants intentionally or recklessly chose not to provide Plaintiff with the assistive devices/supplies and/or medical treatment that he needed to properly ambulate around the jail and inexcusably delayed his release to a hospital that could have stopped or at least slowed the infection's spread into Plaintiff's bloodstream.

130. The defendants intentionally or recklessly chose to withhold the medications he needed to adequately treat his chronic pain and ADHD.

131. Plaintiff's right to receive necessary medical care was at all times clearly established such that a reasonable correction officer, and/or a reasonable member of the medical staff, would have or should have known that their deliberate decisions to ignore the apparent urgency of Plaintiff's medical needs was a violation of his constitutional rights.

15

132. As a direct and proximate result of the defendants' deliberate indifference, Plaintiff sustained punitive damages as well as significant past and future compensatory damages which include but are not limited to the following:

  a.  physical pain and suffering;

  b.  mental anguish;

  c.  fright and shock;

  d.  denial of social pleasure and enjoyments;

  e.  embarrassment, humiliation, and mortification;

  f.  all costs for related mental health/medical care, treatment and services; and

  g.  Loss of earnings and earning capacity.

133. The defendants' actions and/or in-actions were done intentionally and/or with reckless disregard for the substantial risk of harm to the Plaintiff's health and safety in a manner that entitles Plaintiff to an award of punitive and compensatory damages against the defendants in an amount sufficient to punish the defendants and to deter others.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment for all damages to which he is entitled to under the law plus costs, interest, and attorney fees.

### COUNT II: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)-ALLEGAN COUNTY

134. Plaintiff reasserts and incorporates here each allegation stated above.

135. Title II of the ADA guarantees qualified individuals with disabilities an equal opportunity to access the benefits of a public entity's services, programs, or activities. 42 U.S.C. § 12132.

136. Plaintiff was a qualified individual with at least one disability protected by the ADA.  42 U.S.C. §§ 12102, 12131(2).

137. As a result of his pre-existing injuries, Plaintiff suffered from multiple disabilities—within the

16

meaning of the ADA—which primarily resulted in permanent musculoskeletal and neurological damage in his right foot, right hip, low back, and head, as well as anxiety, ADHD, depression, and chronic pain.

138. Defendant Allegan County is responsible for the staff in the jail including its contractors.

139. The jail is a local government agency for Allegan County and is therefore a public entity subject to Title II of the ADA.

140. Under the ADA, public entities like Allegan County are responsible for the discriminatory actions of its staff, including contractors like ACH.

141. Corrections work involving the public, including but not limited to supervising detainees, housing, feeding, clothing, medical care, recreation, and reasonable safety for pretrial detainees (members of the public facing criminal charges) are programs, services, and/or activities within the meaning of Title II.

142. Title II of the ADA guarantees qualified individuals with disabilities an equal opportunity to access the benefits of the services, programs, or activities of a public entity. 42 U.S.C. §12132.

143. Discrimination under Title II of the ADA includes the failure to make a reasonable accommodation or modification in policy, practice, or procedure when such a measure is needed to avoid discrimination on the basis of disability. 28 C.F.R.§ 35.130(b)(7)(i).

144. At all relevant times, Allegan County was obligated to evaluate their services, policies, practices, and their effects or impact and to make reasonable modifications as necessary to achieve compliance with the ADA.

145. In this case, reasonable modification or accommodation could or should have included at least the following:

    a.      an individualized assessment of Plaintiff's needs;

    b.      making an exception to the issuance of the standard jail flip flops;

c.   allowing Plaintiff to retain his boots and orthotic;

d.   providing Plaintiff with an alternative to the standard jail issued flip flops to protect his foot from exposure to the jail's floors or allowing Plaintiff to retain his boots;

e.   providing Plaintiff with a mobility device or tool that would have allowed him to safely ambulate around the jail before and/or after the sores developed underneath his foot to lessen or prevent the effects of weightbearing;

f.   releasing him to a hospital sooner to prevent the occurrence and/or spread of infection; and/or

g.   permitting Plaintiff to continue his prescribed medications for chronic pain, anxiety, and ADHD during his detention.

146. Defendants—*Sgt. LaBrie and Deputy C. Bennear (along with all other jail staff/personnel that were present while Plaintiff was in custody)*—failed to reasonably modify their approach to the booking and receiving process at the jail by refusing to allow Plaintiff to either retain his protective boots and orthotic and by neglecting to extend reasonable accommodations when they knew that Plaintiff suffered from physical disabilities that impaired his ability to safely ambulate through the jail.

147.Defendants—*Dr. Provatas, Kitchen, Rex, Root, J.W., Seinen, Dorman, and Green (along with all other ACH medical staff/personnel that were present while Plaintiff was in custody)* —failed to reasonably modify their approach in providing medical services to Plaintiff when they refused to timely authorize and/or even consider Plaintiff retaining his boots and orthotic and; neglected to reasonably accommodate Plaintiff knowing that he suffered from chronic pain, anxiety, ADHD, neurological damage and musculoskeletal deformities in his right foot, right hip, and low back that impaired his ability to safely ambulate through the jail, amongst other things.

148.Likewise, all jail and/or ACH staff/personnel that were present while Plaintiff was detained and failed to reasonably modify procedures and/or provide him with reasonable accommodations despite the obvious challenges Plaintiff consistently demonstrated to access the benefits and

services provided which included but were not limited to: meals, showering/hygiene, or recreation.

149. The defendants' failure to modify and/or reasonably accommodate Plaintiff violated Title II of the ADA.

150. The failure to provide Plaintiff with a reasonable modification and/or accommodation both impeded and denied his ability to access the benefits and services provided by the jail.

151. The failure to provide a reasonable modification and/or accommodation was itself evidence of the defendants' intentional discrimination against Plaintiff on the basis of his disabilities.

152. Under Title II, a public entity may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others" or "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(ii)–(iii).

153. To ensure compliance with the ADA, public entities, including correction facilities, must provide adequate training so that individuals with disabilities are provided with services in a manner that complies with the ADA.

154. Allegan County failed to provide adequate training for its staff/personnel, the named defendants, on how to supervise, assess, manage, and/or respond to individuals suffering from physical and/or mental disabilities like Plaintiff.

155. Allegan County failed to provide adequate training, even though the named defendants were all likely to encounter situations where such skills would be essential.

156. Under Title II, Allegan County's violation of the ADA proximately caused Plaintiff's injuries which most notably include but are not limited to the multiple amputations needed to contain the

19

spread of infection and to preserve his life.

157. Allegan County's violations of the ADA have caused Plaintiff to sustain intolerable levels of conscious physical, mental, and emotional pain and suffering that he has and will continue to endure for the rest of his life.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment for all damages to which he is entitled to under the law plus costs, interest, and attorney fees.

### COUNT III: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT – ALLEGAN COUNTY

158. Plaintiff reasserts and incorporates here each allegation stated above.

159. The Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability… shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a).

160. Plaintiff was a qualified individual with a disability protected by Section 504 of the Rehabilitation Act. See 29 U.S.C. §794(a); 45 C.F.R. §84.3(j).

161. Allegan County receives federal financial assistance and is therefore covered by the Rehabilitation Act. They are responsible under Section 504 for the discriminatory acts of their employees and contractors like ACJ and ACH.

162. Corrections work involving the public (e.g. members of the public that potentially face being criminally charged) including but not limited to supervising detainees, housing, feeding, clothing, medical care, recreation, and reasonable safety for pretrial detainees are programs, services, and/or activities within the meaning of Section 504.

163. To ensure compliance with Section 504, local and state governments—like Allegan County—must provide adequate training so that individuals with disabilities are provided with services in a manner that complies with Section 504.

164. Allegan County failed to provide adequate training for its staff/personnel, the named defendants, on how to supervise, assess, manage, and/or respond to individuals suffering from physical and/or mental disabilities like Plaintiff.

165. Allegan County failed to provide adequate training, even though the named defendants were all likely to encounter situations where such skills would be essential.

166. The failure of Allegan County to adequately train its staff/personnel, the named defendants, on how to lawfully respond to individuals with physical and mental impairments violated Section 504.

167. Discrimination includes failing to "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or "[p]roviding qualified handicapped persons with an aid, benefit, or service that is not as effective as that provided to others." 45 C.F.R. §84.4(b)(1)(i)-(iii); see 45 C.F.R. §84.52(a)(2)-(3).

168. In this case, a reasonable modification or accommodation could or should have included at least the following:

    a.     an individualized assessment of Plaintiff's needs;

    b.     making an exception to the issuance of the standard jail flip flops;

    c.     allowing Plaintiff to retain his boots and orthotic;

    d.     providing Plaintiff with an alternative to the standard jail issued flip flops to protect his foot from exposure to the jail's floors or allowing Plaintiff to retain his boots;

    e.     providing Plaintiff with a mobility device or tool that would have allowed him to safely ambulate around the jail before and/or after the sores developed underneath his foot to lessen or prevent the effects of weightbearing;

21

f.      releasing him to a hospital sooner to prevent the occurrence and/or spread of infection; and/or

g.      permitting Plaintiff to continue his prescribed medications for chronic pain, anxiety, and ADHD during his detention.

169. Defendants—*Sgt. LaBrie and Deputy C. Bennear (along with all other jail staff/personnel that were present while Plaintiff was in custody)* failed to reasonably modify their approach to the booking and receiving process at the jail by refusing to allow Plaintiff to either retain his protective boots and orthotic and by neglecting to extend reasonable accommodations when they knew that Plaintiff suffered from physical disabilities that impaired his ability to safely ambulate through the jail.

170. Defendants—*Dr. Provatas, Kitchen, Rex, Root, J.W., Seinen, Dorman, and Green (along with all other ACH medical staff/personnel that were present while Plaintiff was in custody)* failed to reasonably modify their approach in providing medical services to Plaintiff when they refused to timely authorize and/or even consider Plaintiff retaining his boots and orthotic and; neglected to reasonably accommodate Plaintiff knowing that he suffered from chronic pain, anxiety, ADHD, neurological damage and musculoskeletal deformities in his right foot, right hip, and low back that impaired his ability to safely ambulate through the jail, amongst other things.

171. Likewise, all the named defendants present while Plaintiff was detained and failed to reasonably modify procedures and/or provide Plaintiff with reasonable accommodation despite the obvious challenges Plaintiff consistently demonstrated to access the benefits and services provided which included but were not limited to: meals, showering/hygiene, or recreation.

172. The failure to provide Plaintiff with a reasonable modification and/or accommodation both impeded and denied his ability to access the benefits and services provided by the jail.

173. The failure to provide a reasonable modification and/or accommodation was itself evidence of the defendants' intentional discrimination against Plaintiff on the basis of his disabilities.

22

174. The defendants intentionally discriminated against Plaintiff because they knew he had physical and mental impairments when they impeded and denied his ability to access the jail's benefits and services.

175. Allegan County's violation of Section 504 proximately caused Plaintiff's injuries which most notably include but are not limited to the multiple amputations needed to contain the spread of infection and to preserve his life.

176. Allegan County's violations of Section 504 have caused Plaintiff to sustain intolerable levels of conscious physical, mental, and emotional pain and suffering that he has and will continue to endure for the rest of his life.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment for all damages to which he is entitled to under the law plus costs, interest, and attorney fees.

### COUNT IV: MUNICIPAL LIABILITY – ALLEGAN COUNTY

177. Plaintiff reasserts and incorporates here each allegation stated above.

178. Plaintiff had rights under the Fourteenth Amendment of the United States Constitution as a pretrial detainee.

179. Municipal liability can be established by showing, amongst other things, that at the time of the violation, there was "a policy of inadequate training or supervision . . . or a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015).

180. The defendants named here acted pursuant to an expressly adopted official policy or widespread/longstanding practice or custom of Allegan County that tolerated violations of its detainees' constitutional rights including or especially detainees like Plaintiff with mental and physical disabilities.

181. Similarly, Defendant Allegan County failed to adequately train, discipline, and/or supervise the named defendants so as to prevent violations of its detainees' constitutional rights including or especially detainees like Plaintiff with mental and physical disabilities.

182. The official policy and/or widespread/longstanding custom within Allegan County of deliberate indifference to the constitutional rights of its detainees, including or especially those with mental and physical disabilities, was the moving force behind the violation of Plaintiff's constitutional rights.

183. Allegan County's failure to adequately train, discipline, and/or supervise the defendants to sufficiently ensure the safety and well-being of their detainees including or especially those with mental and physical disabilities was the moving force behind the individual defendants' deliberate indifference.

184. As a direct and proximate result of Allegan County's deliberate indifference Plaintiff suffered past and future compensatory damages, both economic and non-economic, including but not limited to the following:

    a.    physical pain and suffering;

    b.    mental anguish;

    c.    fright and shock;

    d.    denial of social pleasure and enjoyment;

    e.    embarrassment, humiliation, and mortification;

    f.    all costs for related mental health/medical care, treatment and services; and

    g.    all damages learned through discovery.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment for all damages to which he is entitled to under the law plus costs, interest, and attorney fees

24

**COUNT V: GROSS NEGLIGENCE/WILLFUL & WANTON MISCONDUCT AGAINST DEFENDANTS LABRIE, BENNEAR, PROVATAS, KITCHEN, GREEN, SEINEN, DORMAN, J.W., REX, ROOT, AND EMMONS**

185. Plaintiff reasserts and incorporates here each allegation stated above.

186. The defendants—LaBrie, Bennear, Provatas, Kitchen, Green, Seinen, Dorman, J.W., Rex, Root, and Emmons ("the defendants")—owed Plaintiff a duty to act reasonably and lawfully.

187. The defendants had a duty to avoid acting with reckless disregard.

188. The defendants nonetheless acted so recklessly as to demonstrate a substantial lack of concern that harm or death would result, and/or acted in an unnecessary or willful or wanton manner toward Plaintiff, and was indifferent to the risk that Plaintiff would be severely or gravely injured from being denied a timely and reasonable response to his serious medical needs and/or disabilities as asserted throughout this complaint.

189. The defendants breached the above-stated duties to Plaintiff in several ways and on multiple occasions while in their charge as a pretrial detainee.

190. The most immediate, efficient, and direct cause of harm to Plaintiff was the defendants' failure to timely and reasonably respond to Plaintiff's serious medical and/or mental health needs.

191. The harm caused to Plaintiff was a foreseeable result of the defendants' failure to timely and reasonably respond to his serious medical needs and/or mental and physical disabilities.

192. As the direct and proximate result of the defendants' gross negligence, Plaintiff suffered past and future damages, both economic and non-economic which include but are not limited to the following:

     a.     physical pain and suffering;

     b.     mental anguish;

     c.     fright and shock;

25

d.      denial of social pleasure and enjoyment;

e.      embarrassment, humiliation, and mortification;

f.      all costs for related mental health/medical care, treatment and services; and

g.      all damages learned through discovery.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment

for all damages to which he is entitled to under the law plus costs, interest, and attorney fees.

Respectfully submitted,

**VEN JOHNSON LAW, PLC.**

Dated: August 4, 2026                              by: */s/ Ayanna D. Hatchett*
                                                   Ayanna D. Hatchett (P70055)
                                                   Ven R. Johnson (P39219)
                                                   Christopher Yates (P41017)
                                                   The Hudson's Detroit
                                                   1240 Woodward Avenue, Suite 525
                                                   Detroit, MI 48226
                                                   (313) 324.8300
                                                   ahatchett@venjohnsonlaw.com
                                                   vjohnson@venjohnsonlaw.com
                                                   cyates@venjohnsonlaw.com

26

---

## JURY DEMAND

---

Respectfully, Plaintiff demands a trial by jury. Fed. R. Civ. P. 38(b).


**VEN JOHNSON LAW, PLC.**


Dated: August 4, 2026                    by: */s/ Ayanna D. Hatchett*
                                                Ayanna D. Hatchett (P70055)
                                                Ven R. Johnson (P39219)
                                                Christopher Yates (P41017)
                                                The Hudson's Detroit
                                                1240 Woodward Avenue, Suite 525
                                                Detroit, MI 48226
                                                (313) 324.8300
                                                ahatchett@venjohnsonlaw.com
                                                vjohnson@venjohnsonlaw.com
                                                cyates@venjohnsonlaw.com